IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| HENRY SCOTT REED and CATHY SUE REED, | : | |
| Plaintiffs, | : | |
| vs. | : | CIVIL ACTION NO. 2:05-CV-16-WCO |
| INGLES MARKETS, INC., | : | |
| Defendant. | : | |

**ORDER**

The captioned case is before the court for consideration of defendant Ingles Markets, Inc.'s motion for summary judgment [31-1].

**I. Factual Background**[1]

This case arises out of a slip and fall incident that occurred on May 21, 2004, at an Ingles Supermarket (the "supermarket") located in Gainesville, Georgia. Plaintiff Harry Scott Reed ("Reed") was shopping at the supermarket with his seven (7) year old son Dalton Reed ("Dalton"), who was pushing the shopping cart for his father. (Reed Dep., at 24; Dalton Dep, at 7). Reed had shopped at the supermarket,

---

[1] The recited facts are taken from the parties' statements of material facts and supporting documentation except where otherwise noted.

as well as other stores, on previous occasions. (Reed Dep., at 22). At the time of his fall, Mr. Reed had been in the supermarket for approximately twenty (20) to thirty (30) minutes and had completed most of his shopping. (Reed Dep., at 24, 73). Reed and his son had walked up several aisles and through the front of the store multiple times. (Id. at 77).

Viewed from the front of the store, immediately before the accident, Reed and his son were walking along Aisle 2, to the right of the bread aisle ("Aisle 3"). (Id. at 26-27). Reed needed bread, so he told Dalton that he could wait at the front of the store with the shopping cart or come along with him. (Id. at 26). Reed did not have a problem entering Aisle 3 and, at the time, did not notice the wine display.[2] (Id. at 27, 47). Dalton followed approximately three (3) feet behind his father. (Id. at 26-27). Dalton failed to turn the corner of the aisle, however, and ran the shopping cart directly into the front left corner of the wine display. (Id. at 30; Dalton Dep., at 7). Reed did not see his son strike the rack. (Reed Dep., at 29).

---

[2] The supermarket argues, however, that a person at the front of the store coming from Aisle 2 to Aisle 3 could see the wine rack and would have been walking directly toward it. (Atterholt Dep., at 59; Jacobs Dep., at 43).

Immediately after the shopping cart hit the wine rack, Reed turned around to look at Dalton. (Id. at 30). He saw that Dalton had hit the display and that the bottles on it were unsteady, with at least one (1) bottle of wine having fallen to the floor. (Id. at 29; Dalton Dep., at 11, 14). Despite seeing the wine bottles falling, Reed moved toward the wine display and pushed the shopping cart toward the front of the store. (Reed Dep., at 38). In doing so, Reed fell to the ground and was cut by broken glass. (Id. at 26). Reed cannot say what caused him to fall. (Id. at 39). Furthermore, Reed does not know if he made contact with the wine rack itself. (Id.).

The supermarket's manager, John Atterholt ("Atterholt"), did not witness the incident but recalls hearing a loud noise around the same time that Reed fell. (Atterholt Dep., at 23). Atterholt immediately went to the area in which he heard the noise and found an off-duty emergency medical technician caring for Reed. (Id.). Atterholt also noticed that Reed appeared to be in shock and remembers Reed stating that the wine rack had started shaking and that when he went to catch the bottles, he lost his balance, grabbing the rack as he fell to the ground. (Id. at 47). After providing Reed with ice, Atterholt immediately closed off the area and began to clean the mess. (Id. at 23-24).

The wine rack at issue was provided to United Distributors (the "distributor") by Canandaigua, the maker of Arbor Mist wine, for use in promoting their product. (Todd Dep., at 8-9, 14, 52). One of the distributor's sales representatives, Kelly Dover (the "representative"), set the rack up in the supermarket to display bottles of Arbor Mist about four (4) to six (6) weeks before the incident. (Atterholt Dep., at 28-29). The representative was familiar with the wine rack and had used similar displays in other stores. (Id. at 28). The rack itself was approximately 4.5 to five (5) feet tall and was made of hard plastic. The rack was positioned on the front left side of Aisle 3 so as to be near an ice machine. (Id. at 29). From the front of the store looking rear, the wine display was located at the front, left side of the aisle. (Id., at 30).

Atterholt and the distributor's account manager David Todd ("Todd"), who each have more than twenty (20) years of experience in the supermarket industry, maintain that the rack was a sound piece of merchandising equipment. They assert that such racks are commonly set up at the end of supermarket aisles, even when fully loaded with glass products. According to both, reasonable precautions had been taken to ensure that the display was safe. (Atterholt Dep., at 58, 68-69; Todd Dep., at 26-27, 53). The wine rack had been placed against a

support pole and beside a wooden rack. (Id. at 36, 54). The wooden rack stuck out into the aisle a few inches farther than the wine display. (Id. at 50). Nevertheless, the opening of Aisle 3 was wide enough for two (2) shopping carts to pass through. (Id. at 48; Jacobs Dep., at 49).

The supermarket also had several institutional checks to ensure safety for its customers. As part of Atterholt's duties as manager, he performs a daily walking tour of the store each hour that it is open as well as a more detailed monthly inspection to look for and remove any safety hazards. (Atterholt Dep., at 40, 41, 70; Owenby Dep., at 55). Atterholt had checked Aisle 3 about an hour before the incident took place and does not recall anything unusual or out of place. (Atterholt Dep., at 41). The store's district manager Tim Owenby ("Owenby") also visits the store one (1) to two (2) times per week, during which he and Atterholt walk down each aisle to examine various items, including display racks. (Id. at 51; Owenby Dep., at 45; Adams Dep., at 13). Had either been concerned about the safety of the display, they maintain, it would have been removed from the store. (Atterholt Dep., at 56, 69; Owenby Dep., at 47; Todd Dep., at 54-55).[3] Moreover, neither Atterholt,

---

[3] Several months prior to his deposition testimony, Atterholt signed a declaration that had been presented to him by Reed's counsel which stated that "[Atterholt} realized at the time that the rack was not

Todd, nor Owenby can recall any safety incidents involving the type of wine rack at issue or glass merchandise falling from its shelves.

Reed has retained a safety expert, William Jacobs ("Jacobs"), who has offered a variety of opinions about measures that the supermarket should have taken to prevent an accident. Jacobs admits, however, that there were no safety precautions that the supermarket could have taken with regard to the specific display at issue other than not placing the rack at the front of the aisle. (Jacobs Dep., at 64, 85). Regardless of any other measures that were or could have been taken, Jacobs believes that the supermarket was negligent for allowing the wine rack to be placed at the front of the aisle. (Id.). In Jacobs' opinion, the best way to create a safe retail environment is to place large items like wine bottles on regular shelving in the store. (Id. at 49).

On February 1, 2005, Reed and his wife filed suit in this court against the supermarket, asserting claims for common law negligence and failure to keep store premises safe in violation of O.C.G.A. § 51-3-1.

---

completely stable and that it could turn over or collapse if it was hit by a shopping buggy." (Atterholt Decl. ¶ 8). Atterholt attempted to clarify his statement in his deposition testimony, claiming that he did not have a concern about the particular rack in issue but rather about any rack that is struck by a shopping cart with enough force to cause the rack to turn over or collapse. (Atterholt Dep., at 52, 56, 59, 68).

The supermarket filed the pending motion for summary judgment on December 24, 2005.

**II. Preliminary Matters**

In the instant case, subject-matter jurisdiction over the supermarket is premised on diversity of citizenship between the parties under 28 U.S.C. § 1332. Pursuant to Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), "a federal court in a diversity action must apply the controlling substantive law of the state." Cambridge Mut. Ins. Co. v. City of Claxton, 720 F.2d 1230, 1232 (11th Cir. 1983). Georgia law thus governs the resolution of the claim at issue in this action.

**III. Summary Judgment Standard**

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only those claims for which there is no need for a factual determination and for which there is a clear legal basis are properly disposed of through summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). It is well settled that a court considering a motion for summary judgment must view the evidence in

a light most favorable to the nonmoving party. See Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). It is important to recognize, however, that this principle does not require the parties to concur on every factual point. Rule 56 "[b]y its very terms . . . provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Consideration of a summary judgment motion does not lessen the burden on the nonmoving party. The nonmoving party still bears the burden of coming forth with sufficient evidence. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). However, it is important to note the difference "between direct evidence and inferences that may permissibly be drawn from that evidence. Where a nonmovant presents direct evidence that creates a genuine issue of material fact, the only issue is one of credibility; thus, there is no legal issue for the court to decide." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996). On the other hand, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and

upon which the nonmovant relies, are 'implausible.'" Id. at 743. Adopting language from one of its sister circuits, the Eleventh Circuit stated:

> If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true. Inferences from the nonmoving party's "specific facts" as to other material facts, however, may be drawn only if they are reasonable in view of other undisputed background or contextual facts and only if such inferences are otherwise permissible under the governing substantive law. This inquiry ensures that a "genuine" issue of material fact exists for the fact-finder to resolve at trial.

Id. (citation omitted). "Where the evidence is circumstantial, a court may grant summary judgment when it concludes that no reasonable jury may infer from the assumed facts the conclusion upon which the nonmovant's claim rests." Id.

**IV. Analysis**

Under Georgia law, an owner or occupier of land has a duty to exercise ordinary care to protect invitees from "unreasonable risks of harm of which the owner has superior knowledge." Hamblin v. City of Albany, 272 Ga. App. 246, 247-48 (2005); see also O.C.G.A. § 51-3-1; Pylant v. Samuels, Inc., 262 Ga. App. 358, 359 (2003); Barksdale v. Nuwar, 203 Ga. App. 184, 185 (1992). To establish superior knowledge,

a plaintiff must prove that (1) the defendant had actual or constructive knowledge of a hazard; and (2) it lacked knowledge of the hazard despite the exercise of ordinary care due to actions or conditions within the control of the owner or occupier. See Duvall v. Green, 262 Ga. App. 669, 670 (2003). The plaintiff must also prove that the hazard was in fact the cause of his injuries. See Christopher v. Donna's Country Store, 236 Ga. App. 219, 220-221 (1999).

An owner or occupier is not "an insurer of an invitee's safety." Barksdale, 203 Ga. App. at 185. The law requires only "such diligence toward making the premises safe as the ordinarily prudent person in such matters is accustomed to use." Id. In Georgia, a plaintiff may not recover for injuries caused by hazardous conditions if the plaintiff was aware of the danger. See, e.g., Pound v. Augusta Nat'l, Inc., 158 Ga. App. 166, 168 (1981); Sears Roebuck & Co. v. Reid, 132 Ga. App. 136, 138 (1974). Accordingly, a customer must exercise reasonable care for his own safety. See Alterman Foods, Inc. v. Ligon, 246 Ga. 620, 623 (1980); McCrary v. Bruno's, Inc., 219 Ga. App. 206, 208 (1995) ("[The customer] must make use of all his senses in a reasonable measure amounting to ordinary care in discovering and avoiding those things that might cause hurt to him."); Gaydos v. Gupe Real Estate, 211 Ga.

App. 811, 813 (1994) ("It is incumbent upon the plaintiff to use the degree of care necessary under the circumstances to avoid injury to himself."). A defendant is therefore entitled to summary judgment when the record shows clearly that: (1) the plaintiff had knowledge of the hazard that was equal or superior to that of the defendant, or (2) plaintiff would have had equal or superior knowledge had the plaintiff exercised ordinary care for his personal safety. See Freyer v. Silver, 507 S.E.2d 7, 8 (Ga. Ct. App. 1998).

Without first establishing that a dangerous condition existed, Reed cannot show that the supermarket knew about the danger. See Metts v. Wal-Mart Stores, 269 Ga. App. 366, 367 (2004); Cohen v. Target Corp., 256 Ga. App. 91, 92-93 (2002). Here, Reed's expert, Jacobs, has testified that he believes the rack presented a hazardous condition because glass bottles were placed near the entrance of an aisle.[4] (Jacobs Dep. 65, 85). A merchant, however, has the right to place certain articles in the aisles of its store. See Sadtler v. Winn-Dixie Stores, Inc., 230 Ga. App. 731, 732 (1998); McCrary, 219 Ga. App. at 208. Reed

---

[4] The court assumes without deciding that Jacobs is a qualified safety expert in this case. The court notes, however, that Jacobs has never done any safety consulting for grocery stores and has never been involved in any case relating to grocery stores.

does not dispute that such displays are common. (Todd Dep., at 53, 56). Nor does Reed contend that the wine rack was inherently dangerous or defective. (Jacobs Dep., at 90; Todd Dep., at 36, 37, 49, 53, 54). His safety expert, Jacobs, has also acknowledged that there were no precautions that the supermarket could have taken to make the display safer other than to remove it from the front of an aisle. (Id. 64, 85). Furthermore, Jacobs has admitted that the supermarket did not violate any codes or regulations relating to the placement of the rack in the aisle.

Even assuming that the rack was hazardous, however, the supermarket is not liable because Reed failed to exercise ordinary care. Although a merchant has a right to place items in aisles, it must do so as not to threaten danger to those using the aisle. See McCrary, 219 Ga. App. at 208. The merchant must also insure that the items are in full sight and within the observation of its invitees. Id. In turn, the customer must:

> [E]xercise ordinary care for his own safety, and must . . . . make use of all his senses in a reasonable measure amounting to ordinary care in discovering and avoiding those things that might cause hurt to him.

Alterman Foods, 246 Ga. at 623. Here, the alleged hazard was a static condition. See Becton v. Tire King of N. Columbus, Inc., 246 Ga. App.

57, 59 (2000) ("A static condition is one that does not change and is dangerous only if someone fails to see it and walks into it"). If an invitee knows of a static condition, the proprietor has no liability for the resulting injury to the invitee because the invitee has knowledge equal to the proprietor. See Poythress v. Savannah Airport Comm'n, 229 Ga. App. 303, 306 (1997); Gyles, Inc. v. Turner, 361 S.E.2d 538, 539 (Ga. Ct. App. 1987). "When nothing obstructs the invitee's ability to see the static condition, the proprietor may safely assume that the invitee will see it and will realize any associated risks." Id.

There is nothing in the record to indicate that Reed's view of the wine display was obstructed. The supermarket argues, and the court agrees, that a reasonable person at the front of the store going from Aisle 2 to Aisle 3 would walk directly by the wine rack and would clearly see it. (Atterholt Dep., at 49; Jacobs Dep., at 43). The plain view doctrine precludes recovery where a hazard is in plain view at a location where it is customarily found and can be expected to be found. See Carroll v. Ga. Power Co., 240 Ga. App. 442, 444 (1999) ("[A] plaintiff's actual, subjective awareness of the hazard precludes [] recovery."). Thus, because the condition was open and obvious, Reed had a duty to avoid it through the exercise of ordinary care. See Becton, 539 S.E.2d at 553;

Carroll, 240 Ga. App. at 444-45 (noting that "a shopper walking the aisles of a store knows that every aisle will eventually terminate" and should "maintain a lookout so as not to run into a wall or counter at the end of the aisle").

When he heard the shopping cart hit the display, Reed turned around and saw the unsteady bottles of wine shaking and at least one bottle broken on the floor. (Id. at 29). Knowing that bottles had fallen or were falling, Reed jumped into the area and pushed the shopping cart away from the rack. (Id. at 38). It was at this point that Reed fell to the floor.[5] (Id. at 39). Accordingly, the court finds that Reed failed to exercise ordinary care for his personal safety when he suddenly moved toward the unstable wine rack and broken wine bottles. Such a failure, "when established by plain, palpable, and undisputed evidence," mandates summary judgment in this case. See Carroll, 240 Ga. App. at 442 (citing Robinson v. Kroger Co., 268 Ga. 735, 748 (1997)).

**V. Conclusion**

Based on the foregoing, the supermarket's motion for summary

---

[5] According to Atterholt's testimony, immediately after the accident, Reed stated that the wine rack had started to shake, so he went to catch the bottles, losing his balance and grabbing the wine rack as he fell to the floor. (Atterholt Dep., at 47).

judgment [31-1] is hereby **GRANTED**.

IT IS SO ORDERED, this 4th day of April, 2006.

s/ *William C. O'Kelley*
William C. O'Kelley
Senior United States District Judge